# AFFIDAVIT OF LISA WATERS

STATE OF COLORADO         )
                          ) ss.
COUNTY OF _____       )

I, Lisa Waters, hereby attest under oath and penalty of perjury that the following facts are based upon personal knowledge and true and correct to the best of my knowledge:

1. I am over the age of twenty-one, a resident of the State of Colorado, and the plaintiff in the case styled, <u>Waters v. AXL Academy Charter School</u>, Civil Action 12-CV-1384-LTB, United States District Court for the District of Colorado.

2. I have read the motion to dismiss and for summary judgment filed by AXL Academy Charter School ("AXL") in the above referenced matter ("Motion"). I have also read the affidavit of Audra Philippon, which is attached to the Motion ("Affidavit").

3. I have a Colorado Early Childhood Education ("ECE") license. An ECE license authorizes me to teach students from pre-school through the 3rd grade.

4. I was employed by AXL from July 21, 2008 through June 26, 2011 as a primary lead teacher of 1st and 2nd grade female students. Being a "lead" teacher meant that I "looped" with my students. In other words, I would teach the same female class in both the 1st and 2nd grade.

5. On a number of occasions during my tenure with AXL, Ms. Philippon and others superior to me expressed a lot of dissatisfaction when teachers became pregnant. These same people also treated pregnant teachers poorly. For example, at staff meetings we were regularly told that when we needed to take time off it was a hindrance to many of our colleagues and that people were unable to do their jobs. Teachers with children, typically take days off to care for sick children and rarely do for themselves. These comments were often made at staff meeting right after a teacher had taken time off to stay with her child or gone on maternity leave. My superiors, including Ms. Philippon, regularly told the teachers that when they took time off that they were taking other people away from their jobs and placing a significant burden on AXL. Such statements were commonly made in connection with complaints about teachers becoming pregnant.

6. In July, 2010, which was the beginning of the 2010-2011 school year, AXL held an informational meeting for the teachers to discuss its Handbook and, among other things, its family and medical leave policy. During that meeting, we discussed AXL's allowance of "Family Leave" as described in the Handbook. Around this same time, I also read the Handbook, which is attached to the Affidavit. In particular, I read the "Family Leave" section.

EXHIBIT A

7. I cannot remember how many people AXL employed in July 2010. There have been a number of additions and turn-over in personnel over the years and it is difficult to remember exactly who was there at that time.

8. Shortly after the July 2010, informational meeting, I discovered I was pregnant. Because of the comments made by people at AXL regarding pregnant teachers and the way I had seen pregnant teachers treated, I immediately started worrying whether AXL would let me go.

9. In July 2010, I asked Ms. Philippon whether I could take maternity leave. Ms. Philippon told me that "it would not be a problem." Over the school year, I repeatedly confirmed with AXL that I would be taking maternity leave from January 24, 2011 through March 21, 2011. In addition, I spoke with Ms. Philippon, Ms. Avila, and others on several occasions regarding the timing and length of my maternity leave, as well as the accommodations I would need after my leave. Specifically, I requested that I be relieved during my lunch hour so that I could express breast milk.

10. Although Ms. Philippon originally said that my maternity would not be a "problem," she made a number of comments to me as my leave drew near. Specifically, on multiple occasions, Ms. Philippon complained that my absence would place a significant burden on AXL.

11. AXL never told me that it was not subject to the Family and Medical Leave Act ("FMLA"). AXL further never told me that I was ineligible for FMLA leave or for my requested maternity leave.

12. Because of the informational meeting in July 2010, the statements contained in AXL's Handbook, AXL granting my request for maternity leave, my own knowledge regarding the FMLA, and the numerous conversations I had with my AXL superiors regarding my leave, I believed that I had the right to take maternity leave and that AXL should not terminate me as a result of doing so. If I had known that AXL could have terminated me for taking maternity leave, I would not have taken a two month leave to care for my newborn baby.

13. While I was on maternity leave and due to AXL's treatment of pregnant teachers, I felt that I needed to offer help to my co-teacher and my substitute in order to protect my job. I did not want my leave to be a burden on AXL. Therefore, as reflected in the emails attached to the Motion, I continually asked if I could help to make sure that my leave was not a burden on AXL. If Ms. Philippon had not made the comments about my maternity leave being a burden on AXL and I had not seen and heard AXL's poor treatment of pregnant teachers, I would have not contacted the school while on leave.

14. While I was on leave, I found out that AXL had decided not to sponsor my substitute's visa application. From comments made by co-workers, it appears that my substitute immediately started putting in less effort. Wanting my class to do well and wanting to show AXL that I was not a burden, I offered even more assistance to AXL staff.

EXHIBIT A

15. I strongly disagree with Ms. Philippon's description of our meeting on April 7, 2011. Present at that meeting were Ms. Philippon, Ms. Tammi Avila, and me. After a few pleasantries, Ms. Philippon stated that she was just "going to cut to the chase" and told me that I was not a "good fit" for AXL. She stated that she did not think that expeditionary learning – AXL's preferred teaching method – was a good fit for my teaching style. She expressed some concern over my students' aptitude test scores from that year and said that I had let my class down. Ms. Philippon further stated that AXL was not going to renew me for the 2011-2012 school year, but that I would be allowed to finish the school year with my students because the class had had "enough disruptions." I understood this comment to refer to my having taken maternity leave. Ms. Philippon further said "We are sure that you will find something else out there" and "I will do whatever to help you find something else." As a result of these statements, I understood that my employment with AXL would be terminated at the end of the school year – June 26, 2011. When the meeting ended, Ms. Philippon commented that 3rd grade boys position was open and she "may consider" placing me there. Not wanting to lose an opportunity to continue my employment with AXL, I said that I would give "100%" to such an opportunity. No one at AXL ever spoke to me again about the 3rd grade boys' class. AXL never offered me that position.

16. Although I would have taken the 3rd grade position, it would have amounted to a demotion. First, teaching the 3rd grade boys would not allow me to loop with them through the 4th grade, as my ECE license only covers preschool through 3rd grade. Therefore, I would have lost my "lead teacher" status. I certainly would not have received the customary bonus and raise if I had been transferred to the 3rd grade boys' class. Frankly, I would have been greatly embarrassed to be moved to a non-looping position. This change would definitely be viewed as a demotion by all the teachers at AXL. Furthermore, teaching the 3rd grade class would have been virtually an entirely new job. First, AXL uses different techniques, dynamics, and styles to teach the male students. Further, the curriculum for the 3rd grade boys would be wholly different than what I taught for the 1st and 2nd grade girls. Finally, I think that the demotion from a regularly looping teacher with 1st/2nd grade girls to 3rd grade boys would have hurt my future employment opportunities.

17. I strongly disagree with Ms. Philippon's description of AXL's purported efforts to accommodate my need to express breast milk after I returned from maternity leave. Before I went on leave, it was agreed that Nathan Burns, an AXL employee, was to cover for me and watch my students during the lunch hour and for a 20 minute afternoon recess so that I could express breast milk in a private. When I got back from leave, however, this was not the case. Although Mr. Burns tried, AXL gave him a lot of other responsibilities and duties, which ultimately resulted in him not being able to cover for me on numerous occasions. When he was unavailable, I would call the front desk at AXL to see if someone else could help and they would just tell me that "sorry, we aren't going to be able to help you today." I repeatedly complained to Ms. Philippon and Ms. Avila but nothing was done.

18. AXL's failure to have someone cover me so that I could express breast milk caused me a great amount of pain. Further, because I was unable to express breast milk as agreed, my top became wet on a number of occasions. Having my co-workers and students see

3

EXHIBIT A

me like that was extremely embarrassing. Eventually, as AXL's failure to provide coverage continued, it ultimately caused my milk production to slow.

19. As a result the comments and treatment of pregnant teachers at AXL, specific comments made to me as the time of my leave approached, and the actions AXL took against me (e.g., not renewing me, failing to accommodate my need to express breast milk, etc.), I believe that AXL chose not to renew me, at least in part, because I took maternity leave.

20. AXL treated non-pregnant teachers much more favorably than pregnant teachers. As stated above, Ms. Philippon cited my students' aptitude scores when she informed me on April 7, 2011, that AXL would not renew me. However, AXL renewed Bryan Long (male and non-pregnant) and Kira Grush (female and non-pregnant) though their students received virtually identical scores as my students on the aptitude test. I further understand that Allison Siefert replaced me as the lead teacher for the 1st and 2nd grade girls' class. I understand that she was not pregnant at the time she was assigned to those classes.

21. After I filed my charge of discrimination with the Colorado Civil Rights Division, AXL was provided with an opportunity to mediate. AXL refused.

22. Under penalties of perjury, I declare that the statements contained herein are to the best of my knowledge and belief, true, correct and complete.

FURTHER AFFIANT SAYETH NOT.

_____
LISA WATERS

Subscribed and sworn to before me by LISA WATERS on the 22 day of August, 2012.

WITNESS MY HAND AND OFFICIAL SEAL.

My Commission expires: March 18, 2015

_____
Notary Public

[SEAL]

SUSANNE BELVEAL   NOTARY PUBLIC
COUNTY OF SUBLETTE   STATE OF WYOMING
MY COMMISSION EXPIRES MARCH 18, 2015

4

EXHIBIT A



**Send and Receive Fax Service**

Pinedale
43 South Sublette
Pinedale, WY 82941
Voice (307) 367-6763
Fax (307) 367-2864

Big Piney
306 Budd Ave.
Big Piney, WY 83113
Voice (307) 276-5250
Fax (307) 276-5254

# FAX COVER SHEET

Date: 8/22/12
Time: _____

TO
NAME: Leah Vandschoot
COMPANY: The Litigation Boutique
TELEPHONE:
FAX NUMBER: 303-355-2199

FROM
Lisa Waters

COMMENTS: Please shoot me an email to let me know that you received this!

Lisa

PAGE 1 of ___

EXHIBIT A